**HADERLEIN AND KOUYOUMDJIAN LLP**
Jonathan Haderlein (Cal. Bar No. 336644)
jhaderlein@handklaw.com
Krikor Kouyoumdjian (Cal. Bar No. 336148)
kkouyoumdjian@handklaw.com
19849 Nordhoff St.
Northridge, California 91324
Telephone:  (818) 304-34345

**RUSSELL LAW, PC**
L. David Russell (Cal. Bar No. 260043)
david@russelllawpc.com
1500 Rosecrans Ave, Suite 500
Manhattan Beach, California 90266
Telephone: (323) 638-7551

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMELIA BLACKBURN, an individual on her own behalf and on behalf of all others similarly situated; and TAYLOR BLACKBURN, an individual on her own behalf and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ETSY, INC., a Delaware Corporation, <br><br> Defendant. | Case No.: <br><br> **CLASS ACTION COMPLAINT** |

1

Plaintiffs Amelia Blackburn and Taylor Blackburn ("Plaintiffs"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief—except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge—against Defendant Etsy, Inc. ("Defendant" or "Etsy").

### NATURE OF THE ACTION

1.      This is a class action lawsuit, brought on behalf of a putative nationwide class, or alternatively a putative class of California residents, of users of Defendant's e-commerce platform, against Defendant for grossly misrepresenting the total environmental impact of its business operations in its advertisements, corporate announcements, and promotional materials.

2.      Defendant is an American technology company that runs an e-commerce platform ("the Platform") that allows vendors to sell goods directly to consumers, with a traditional focus on handmade or vintage items and craft supplies.

3.      Since February 2019, Defendant has claimed to be the "the First Global eCommerce Company to Completely Offset Carbon Emissions from Shipping" across various channels including press releases, LinkedIn posts, advertisements, and webpages.

4.      Reasonable consumers reviewing these representations would believe that when taking account of all of Defendant's carbon emissions and related green investments, shipping sales made on Defendant's operation of its e-commerce platform have not been responsible for releasing any net additional carbon into the atmosphere since February 2019.

5.      Defendant has represented that the e-commerce platform's shipping is "100% offset" because of carbon offsetting via participation in the voluntary carbon offset market.  The voluntary carbon offset market is a loose arrangement

of companies and NGOs that facilitate investment in green projects such as renewable energy and prevention of deforestation.  In exchange for their investment in these projects, companies receive "carbon offsets" in the form of credits that purport to verify the amount of carbon that was not released due to the company's investments in the offset market.  Defendant's claim of carbon neutrality therefore hinges on an underlying set of representations—that since February 2019 Defendant's investments in the voluntary carbon offset market have entirely offset the CO2 emissions from shipping products purchased on Defendant's e-commerce platform.

6.     Plaintiffs have since discovered that any such representations are manifestly and provably false.  As explained below, foundational issues with the voluntary carbon offset market mean the purchase of said offsets cannot make a company's emissions "carbon neutral," and both scientists and government regulators have specifically identified Defendant as one of many companies who have grossly misstated the actual carbon reduction produced by their carbon offset portfolio.  At the same time, Defendant's operation of an e-commerce platform causes significant net carbon dioxide ("CO2") to be released into the atmosphere.   Accordingly, any claim of "100% offsetting" emissions from shipping is false and misleading; it is not carbon neutral to ship goods sold on Defendant's e-commerce platform, and consumers would not have purchased goods on Defendant's e-commerce platform, or would have paid substantially less for them, had they known the claim of 100% offsetting emissions from shipping was false.

7.     Plaintiffs and the putative class were wronged by these actions. There is a significant market premium for green products, and specifically products that do not contribute to climate change.  Since February 2019, Plaintiffs purchased products on Etsy's e-commerce platform at a market premium due to their belief that by using Etsy's e-commerce platform over

CLASS ACTION COMPLAINT

another, they engaged in more ecologically conscious consumption and participated in a global transition away from carbon emissions. During this entire period, Defendant's e-commerce platform still produced massive amounts of CO2 from shipping, and its reliance on the voluntary carbon offset market in no way prevents its "100% offset" representations from being false and misleading. Plaintiffs would not have utilized Defendant's e-commerce platform, or at the very least would have paid substantially less for their purchases or sales on the platform, if they understood at the time of purchase that Defendant's carbon offsetting representations were false.

8. Plaintiffs are repeat purchasers of Defendant's e-commerce platform, who assert claims on behalf of themselves and similarly situated purchasers on Defendant's e-commerce platform for (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, et seq., (ii) violation of California's False Advertising, Business and Professions Code § 17500, et seq. ("FAL"), and (iii) Unlawful, unfair, and fraudulent trade practices in violation of California's Business and Professions Code § 17200.

## **PARTIES**

9. Plaintiff Taylor Blackburn is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Los Angeles, California. Plaintiff Taylor Blackburn makes her permanent home in Los Angeles and intends to remain in Los Angeles.

10. Plaintiff Amelia Blackburn is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Los Angeles, California. Plaintiff Amelia Blackburn makes her permanent home in Los Angeles and intends to remain in Los Angeles.

11. Defendant Etsy, Inc. is a corporation incorporated under the laws of the state of Delaware, with its principal place of business in New York, New York. Defendant markets and operates its e-commerce platform worldwide and

CLASS ACTION COMPLAINT

throughout the United States, including the state of California. Defendant operated and marketed its e-commerce platform during the class period.

12.     Each Plaintiff has either purchased goods from Defendant's e-commerce platform and/or sold goods on Defendant's e-commerce platform multiple times since February 2019.  Plaintiff Taylor Blackburn has made 16 purchases on Etsy since February 2019, beginning with a purchase on March 7, 2019, and ending with a purchase on February 23, 2023.  Her purported carbon offsetting is logged on her account page as follows:



13.

14.     Plaintiff Amelia Blackburn has made 20 purchases on Etsy since February 2019, her purported carbon offsetting is logged on her account page as follows:



15.

16.     Plaintiffs viewed Defendant's offsetting representations on the e-

commerce platform, both on their user pages and on at the point of sale for every product they purchased, as well as in advertisements, LinkedIn posts, and reporting in which Defendant touted itself as 100% offsetting emissions from shipping.  Plaintiffs relied on Defendant's representations that Defendant 100% offset emissions from shipping.  Plaintiffs saw these representations prior to, and at the time of using Defendant's e-commerce platform, and understood them as representations and warranties that the e-commerce platform they had used was run by a business that would offset all emissions generated by shipping goods sold on the platform.  Plaintiffs understood "100% offset" to mean that no net additional carbon was released into the atmosphere from shipping products purchased on Defendant's e-commerce platform. Plaintiffs relied on these representations and warranties in deciding to use Defendant's e-commerce platform, rather than another e-commerce platform. Accordingly, those representations and warranties were part of the basis of the bargain, in that they would not have used the Platform on the same terms had they known those representations were not true.  In making their purchases or sales, Plaintiffs paid a substantial price premium due to the false and misleading 100% offsetting claim. Had Plaintiffs known that the 100% offsetting claim was false and misleading, Plaintiffs would not have paid a market premium to use the Platform. Plaintiffs did not receive the benefit of their bargain because the platform they used did not, in fact, fully offset emissions from shipping.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) Plaintiffs and Defendant are citizens of different states.

18.     This Court has supplemental jurisdiction over any state law claims

pursuant to 28 U.S.C. Section 1367.

19.    The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducted and/or solicited business in, engaged in other persistent courses of conduct in, and/or derived substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

21.    In accordance with California Civil Code Section 1780(d), each plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, he or she bought goods on Defendant's e-commerce platform while located in California.

22.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

### **A.    Environmental Impact is a Compelling Consideration for Consumers**

23.    The changing climate is widely appreciated as the crisis of our times.  "Human activities, principally through emissions of greenhouse gasses (GHG), have unequivocally caused global warming, with global surface temperature reaching 1.1°C above 1850-1900 in 2011-2020."[1]  "Observed warming is human-caused, with warming from greenhouse gasses, dominated by $CO_2$ and methane (CH4)."[2]

---

[1] Hoesung Lee et al., Synthesis Report of the IPCC Sixth Assessment Report 6 (Steven K Rose et al. eds., 2022).
[2] *Id.*

CLASS ACTION COMPLAINT

24.     Given the current severity of climate change issues, interest in environmentally friendly ("green") consumption is at an all-time high.  For many consumers, the environmental impact of a company's supply chain and operations has a significant impact on their purchasing decisions.  As the Supreme Court of California has observed, "[t]o some consumers, processes and places of origin matter.  Whether a particular food is kosher or halal may be of enormous consequence to an observant Jew or Muslim.  Whether a wine is from a particular locale may matter to the oenophile who values subtle regional differences.  Whether a diamond is conflict free may matter to the fiancée who wishes not to think of supporting bloodshed and human rights violations each time she looks at the ring on her finger. And whether food was harvested or a product manufactured by union workers may matter to still others." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 328–29, 246 P.3d 877, 889–90 (2011).

25.     The same is true of a company's environmental footprint.  "87% of consumers will have a more positive image of a company that supports social or environmental issues.  88% will be more loyal to a company that supports social or environmental issues.  87% would buy a product with a social and environmental benefit if given the opportunity."[3]  At the same time, "[i]n spite of consumers' willingness to contribute to a greener and more circular economy in their everyday lives, their active and effective role in this green transition is hampered by" "a lack of trust in the credibility of environmental claims and the proliferation of misleading commercial practices related to the environmental sustainability of products."[4]

26.     In the interest of maintaining consumer loyalty and maintaining market position, companies have rolled out various environmental initiatives to

---

[3] Adam Butler, *Do Customers Really Care About Your Environmental Impact?*, FORBES (Nov. 21, 2018, 8:00 AM), https://www.forbes.com/sites/forbesnycouncil/2018/11/21/do-customers-really-care-about-your-environmental-impact/?

[4] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 2 (2023).

CLASS ACTION COMPLAINT

encourage consumers to continue to purchase their products.  These initiatives have led to accusations of "greenwashing"—referring to when environmentally harmful products and services are rebranded as more ecologically conscious than they are in fact.  Greenwashing is difficult for consumers to identify, as by definition, the inherent information asymmetry between corporations and individual consumers means that "[c]onsumers cannot verify green attributes directly and must rely on such signals as eco-labels to authenticate claims."[5]

27.     These efforts are effective at changing consumer perceptions.  In one study, "[o]ver half (57%) of consumers (in the control condition) believed that greenwashed claims were a reliable source of information about a company's eco-practices. Consumers were also much more likely to agree that greenwashing energy companies had strong green credentials, compared to energy companies depicted in a non-greenwashed advertisement."[6]

**B.     A Brief Primer on the Voluntary Carbon Offset Market**

28.     "Carbon offsets have become a popular tool in global efforts to mitigate climate change.  These programs work by offering regulated polluters the opportunity to increase their own emissions if they subsidize equivalent emission reductions in unregulated markets."[7]

29.     "The most common offsets are based on avoiding the release of additional carbon dioxide into the atmosphere, for example by preventing deforestation or supporting renewable energy projects.  The other, much more expensive, option is to fund programs that actually remove $CO_2$ by planting forests or employing machines that capture greenhouse gas from the air and store

---

[5] Lucy Atkinson & Sonny Rosenthal, *Signaling the Green Sell: The Influence of Eco-Label Source, Argument Specificity, and Product Involvement on Consumer Trust*, JOURNAL OF ADVERTISING, Feb. 2014, at 33, 33-45.
[6] *Protecting consumers from Greenwashing*, THE BEHAVIOURAL INSIGHTS TEAM BLOG, (Jun. 23, 2022), https://www.bi.team/blogs/there-is-a-growing-epidemic-of-climate-anxiety/
[7] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 1 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

CLASS ACTION COMPLAINT

them away."[8]

30.   "Offset logic goes like this: If it is cheaper for a company to buy an offset that cuts emissions somewhere else instead of in their own operations, then offsets are cost effective."[9]  "With each investment, the corporations rack up "credits" for the forests they save or restore, tokens representing a set amount of carbon dioxide ostensibly kept out of the atmosphere by storing it safely in the trees."[10]

31.   "On its face, the exchange seems like a win-win: Huge sums of money are funneled into environmental projects, mostly in poor countries with less ability to pursue large-scale forest protection on their own," while companies "can say they're zeroing out their carbon footprints by offsetting whatever emissions they can't eliminate from their own operations with $CO_2$ reductions elsewhere on the planet."[11]

32.   "The last decade has seen billions of carbon offsets issued to project developers around the world, providing opportunities for regulatory compliance at lower cost."[12]  Interest in preventing deforestation projects has risen "[i]n recent years, [as] a long list of Fortune 500 companies has begun purchasing credits from forest projects."[13]  "The market for [forestation carbon offset credits] credits is estimated in the hundreds of millions of dollars, a number

---

[8] Jess Shankleman & Akshat Rathi, *Net Zero Is Hard Work, So Companies Are Going 'Carbon Neutral'*, BLOOMBERG (Jul. 19, 2021, 3:50 AM), https://www.bloomberg.com/news/articles/2021-07-19/offsets-can-play-a-role-to-make-companies-carbon-responsible#xj4y7vzkg

[9] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[10] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[11] *Id.*

[12] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[13] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

CLASS ACTION COMPLAINT

growing year upon year as a cottage industry to sell, trade and authenticate forest credits has taken shape."[14]

33.    Offset programs all promote themselves as nominally certified. Certification and verification is essential—"when offset programs support projects that would have been developed anyway, they not only waste the limited resources available to mitigate climate change but also contribute to climate change by increasing global emissions."[15]  Unfortunately, the voluntary carbon offset market is self-regulated, leading to "multiple, competing 'certification' standards and a dizzying array of organizations or companies that act as middlemen, authenticating supposed greenhouse gas reductions and connecting credit buyers and sellers."[16]  Lack of standardization is not the only barrier to verification, as the market is also plagued by structural inabilities to track genuine progress and poor mathematical modeling.  For instance, in the context of prevented deforestation, "[m]easuring activity on the ground in far-flung rainforests can be incredibly difficult."[17]  And in an analysis of the "world's largest carbon offset program," which primarily arranges for the purchase of renewable energy offsets, researchers estimated "that at least 52% of approved carbon offsets were allocated to projects that would very likely have been built anyway"—"a substantial misallocation of resources."[18]

34.    There are also inherent conflicts of interest in the standard offset verification process.  According to ecologist Dan Nepstad, the president of the Earth Innovation Institute, "the carbon project developer" "hires the auditors.  So

---

[14] *Id.*

[15] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30  (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[16] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[17] *Id,*

[18] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30  (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

CLASS ACTION COMPLAINT

the auditors are working for the company that would benefit, really, from a good result."[19]  That means "it's up to companies to do their own due diligence to know that the credits they're buying are legitimate."[20]

### C. Companies Purchase Carbon Offsets to Claim Carbon Neutrality, and Said Representations are Effective on Consumers

35.     Certain companies have also announced their operations are "100% CO2 compensated" or working towards becoming "net-zero."  Climate-related claims that products or services are "100% CO2 compensated" are often predicated on the company having "offset" its carbon emissions by purchasing "carbon credits" "generated outside the company's value chain, for example from forestry or renewable energy projects."[21]  The basic premise of carbon offsets is that a company will invest money into a project with ostensibly positive environmental impact and in return they will receive "carbon offset credits" that estimate the project's carbon-reducing impact.  Though the "methodologies underpinning offsets vary widely and are not always transparent, accurate, or consistent,"[22] in theory, a company will only claim "100% offsetting" when they have accrued enough carbon credits in a year to fully "offset" the carbon emissions produced by the benchmark in question.  In the words of Etsy's Senior Editor, Jackie Buddie, 100% offsetting all emissions from shipping means that "every time you receive a package from Etsy, we balance out the carbon emissions by investing in emissions reduction projects."[23]

36.     Carbon offsetting representations are effective on consumers,

---

[19] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[20] *Id.*

[21] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).

[22] *Id.*

[23] Jackie Buddie, *Delivering a World of Good*, ETSY, INC. (Feb. 27, 2019), https://www.etsy.com/blog/etsy-launches-carbon-offset-shipping

CLASS ACTION COMPLAINT

especially for products that consumers identify as otherwise environmentally harmful.  A 2015 study found that "the presence of a carbon-neutral label in an advertisement, regardless of the type of product, leads to more favorable perceptions of company environmental concern" while the presence of the carbon neutral label leads to "more pronounced increase[s]' in consumer perceptions of company environmental concern" when the product in question is "environmentally harmful" than when it is "environmentally neutral."[24]

37.    This is further corroborated by a March 2022 report documenting "a simulated market study" which "revealed that 87% of Americans value carbon-neutral labeled products over similar 'unlabeled' products" and "that this value is driven by better brand perceptions and feeling better when buying the product." This value was not merely reputational; "[p]eople placed a considerable monetary value on carbon-neutral products." In particular, an experiment found "that consumers consistently reported they were willing to pay more for [carbon-neutral] labeled products compared to equivalent products in a shopping scenario.  The [carbon-neutral] label held substantial appeal across demographics, skewing slightly towards women. Carbon neutral products were similarly appealing across income, post-high school education levels, race, and age."[25]

### D.    Etsy Claims its Shipping is 100% Carbon Offset

38.    Since February 2019, Defendant has marketed itself across various platforms as "100% offsetting all carbon emissions from shipping."  A February 2019 webpage says that Etsy is "becoming the first major online shopping destination to offset 100% of carbon emissions generated by shipping."[26]

---

[24] Amy Stokes & Anna M. Turri, *Consumer Perceptions of Carbon Labeling in Print Advertising: Hype or Effective Communication Strategy?*, JOURNAL OF MARKETING COMMUNICATIONS, 2015, at 300, 300-315.

[25] Graham Gephart, *Understanding How Consumers Value Climate Neutral Certification*, CLIMATE NEUTRAL (Mar. 30, 2022), https://www.climateneutral.org/blog/understanding-how-consumers-value-climate-neutral-certification

[26] Jackie Buddie, *Delivering a World of Good*, ETSY, INC. (Feb. 27, 2019),

CLASS ACTION COMPLAINT

39.     In Etsy's Annual SEC 10-K disclosure for 2020, Etsy announced it "met our goal to run a carbon neutral business for 2020 by investing in over 400,000 verified emissions reductions."[27]  Nearly identical representations were made in Etsy's 2021 and 2022 10-K disclosures.

40.     These representations have persisted: as of May 7, 2023, Etsy's corporate impact landing page, titled "Committing to a world of good," states that Etsy continues to "offset 100% of carbon emissions from shipping and packaging on every delivery."[28]

41.     These representations are not limited to advertising, marketing, and shareholder disclosures—Etsy repeats the following at the point of sale of *every* product on Etsy's website: "Etsy offsets carbon emissions from every delivery."

42.     The following representation appears on every Etsy Checkout page:



43.     For context, here is a screenshot of the Etsy Checkout page from May 7, 2023:

---

https://www.etsy.com/blog/etsy-launches-carbon-offset-shipping

[27] Etsy, Inc., Annual Report (Form 10-K), at 18 (Feb. 27, 2020).

[28] *Committing to a World of Good,* ETSY, INC., https://www.etsy.com/impact?utm_medium=editorial_internal&utm_source=etsy_blog&utm_campaign=carbon-neutral&ref=blog (May 28, 2023, 3:16 PM).

14

CLASS ACTION COMPLAINT

44.     Etsy also memorializes the "Impact" of these offsets on every user's account:



45.     A consumer's "impact" is logged per customer, and memorialized at that page as follows:



**E.      Defendant's Claims of 100% Offsetting Emissions from Shipping are False and Misleading**

46.     Etsy's representations of carbon neutrality are provably false and misleading, as nearly all offsets issued by the voluntary carbon offset market overpromise and underdeliver on their net carbon impact due to endemic methodological errors and fraudulent accounting on behalf of offset vendors.

This results "in offset credits of low environmental integrity and credibility that mislead consumers when they are relied upon in explicit environmental claims."[29]  "The methodologies underpinning offsets vary widely and are not always transparent, accurate, or consistent" leading to "significant risks of overestimations and double counting of avoided or reduced emissions."[30]  The primary issues with the carbon offset market are the offsets' lack of verifiability, additionality, immediacy, and durability as explained in more detail below.[31]

47.    Any one of these issues can mean that "a proposed offset won't actually reduce emissions much, if at all."  And only "when companies have achieved all the reductions they possibly can, and balanced the rest with carbon removals, would they achieve 'carbon-neutrality.'"[32]  This is because "if it would be preferable to simply avoid (not offset) the emissions in a scenario where the world followed an efficient and equitable approach to eliminating emissions, the act of offsetting cannot make up for this forgone opportunity.  Instead, the act of offsetting merely sets the world on a slightly less worse path, but one that still deviates from what is optimal."[33]  This is particularly true when "carbon credits are sold by companies to 'compensate' for an activity where optimal mitigation pathways require consumer behavioral change," such as having consumer buy local rather than primarily purchasing goods that need to be shipped over long distances.[34]

48.    The offset industry is replete with well-documented problems, explained further below.  Regardless of those granular details, it is simply

---

[29] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).
[30] Id.
[31] Betsy Vereckey, How to Choose Carbon Offsets that Actually Cut Emissions, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions
[32] Jess Shankleman & Akshat Rathi, Net Zero Is Hard Work, So Companies Are Going 'Carbon Neutral', BLOOMBERG (Jul. 19, 2021, 3:50 AM), https://www.bloomberg.com/news/articles/2021-07-19/offsets-can-play-a-role-to-make-companies-carbon-responsible#xj4y7vzkg
[33] DERIK BROEKHOFF, EXPERT REPORT 5 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).
[34] Id. at 6.

indisputable that issues with the offset market have been well-documented and publicized.   "In the EU, a 2021 study revealed that 85 percent of offsets failed to reduce emissions.  In response, EU member states decided offsets would not count toward European climate goals after 2021."[35]  "In 2019, a study similarly found that 82 per cent of California's offset credits do not provide climate benefits."[36] Yet despite all of these concerns, Etsy has been specifically identified as a company that relies on dubious offsets that fall victim to all of these issues, rendering its claims of carbon neutrality false and misleading and particularly injurious in light of Etsy's massive CO2 footprint as a major e-commerce platform.[37]

> i.   Etsy's Purportedly "Verified" Offsets Are Predicated on Misleading and Unverifiable Accounting of Carbon Impact

49.     The first reason it is false and misleading for Etsy to represent it is carbon neutral on the basis of its offsets portfolio is that Etsy's offsets are predicated on misleading and unverifiable accounting of the offset's carbon impact, due to the voluntary carbon market's "tendency to inflate" net carbon impacts, resulting "in phantom carbon credits."[38]  Accurate accounting is essential for carbon neutrality claims to be true, as "[if a company's] calculations are not perfect, you're doing harm," due to the fact that the offsets need to meaningfully cancel out "[t]he consequences of adding carbon dioxide to the atmosphere," which "extend centuries, if not millennia, into the future."[39]

---

[35] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions

[36] *Id.*

[37] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[38] Patrick Greenfield, *Carbon Offsets Used by Major Airlines Based on Flawed System, Warn Experts*, THE GUARDIAN (May 4, 2021), https://www.theguardian.com/environment/2021/may/04/carbon-offsets-used-by-major-airlines-based-on-flawed-system-warn-experts

[39] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions

50.     Verification is important for all kinds of offsets.   Whether they are in the form of avoided deforestation, avoided emissions, or green technology investments, a company "must be able to verify that emissions actually fall.  If you're going to plant trees, you have to verify that they were actually planted and that they will survive for decades to come.  If you fund efficient, low-emission cook stoves for the rural poor in the developing world, you have to verify that they are actually delivered, kept in working condition, and used."[40]

51.     Yet the voluntary carbon market is replete with dubious projections misleadingly packaged as guarantees.  "Research into Verra, the world's leading carbon standard for the rapidly growing $2bn (£1.6bn) voluntary offsets market, has found that, based on analysis of a significant percentage of the projects, more than 90% of their rainforest offset credits – among the most commonly used by companies – are likely to be 'phantom credits' and do not represent genuine carbon reductions."[41]

52.     The three major voluntary carbon credit vendors from whom Defendant purchases offsets have repeatedly engaged in fraudulent projections that grossly overstate their guarantee of carbon reduction.  One major problem is fraudulent baselining.  Researchers have found that in the context of avoided deforestation, "in all projects that established crediting baselines using historical trends," "the crediting baselines significantly overstate deforestation in comparison to the counterfactual estimates based on synthetic controls."[42] Investigations have further revealed that all three major voluntary carbon markets have engaged in fraudulently double and triple counting of projects, crediting

---

[40] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[41] Patrick Greenfield, *Revealed: More Than 90% of Rainforest Carbon Offsets by Biggest Provider are Worthless, Analysis Shows*, THE GUARDIAN (Jan. 18, 2023), https://www.theguardian.com/environment/2023/jan/18/revealed-forest-carbon-offsets-biggest-provider-worthless-verra-aoe

[42] THALES A. P. WEST ET AL., OVERSTATED CARBON EMISSION REDUCTIONS FROM VOLUNTARY REDD+ PROJECTS IN THE BRAZILIAN AMAZON  3 (ERIC F. LAMBIN ED., NAT'L ACAD. OF SCI., 2020).

CLASS ACTION COMPLAINT

several companies with the entire carbon offset from the same plot of land.[43][44]

53.     These issues are specific to Etsy's offset portfolio.  Etsy's offset portfolio is primarily composed of green technology investment offsets,[45] with an additional substantial investment in prevented deforestation.[46]  According to Etsy's 2020,[47] 2021,[48] and 2022 SEC 10-K disclosures,[49] Etsy attempted to achieve "carbon neutrality" via offsets that "protect forests, sponsor wind and solar farms, and help develop greener methods for producing auto parts."  These include investments in "187,876 acres of native, mixed hardwood forests in Minnesota that supply timber to the UPM Blandin paper mill,"[50] and a "Bundled Wind Power Project is located in Gujarat and Madhya Pradesh."[51]

54.     Yet, these are precisely the kinds of offsets that are most likely to be the product of inaccurate baselining and double counting.  As noted above, a review of the world's largest sustainable energies project, CDM, whose wind and solar power investment projects in India have generated carbon offsets present in Etsy's offset portfolio, revealed that there were serious issues with the project's baseline assumptions, undermining the likely value of more than half of the offsets sold by the project.[52]  The same is true for deforestation projects.  Etsy's agricultural, forestry and other land use offsets were all verified by the carbon

---

[43] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) (2023).

[44] DERIK BROEKHOFF, EXPERT REPORT (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).

[45] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[46] *UMP Blandin Native American Hardwoods Conservation Project*, 3DEGREES GROUP, INC., https://3degreesinc.com/resources/blandin-conservation-project/ (May 28, 2023, 4:09 PM).

[47] Etsy, Inc., Annual Report (Form 10-K) (Feb. 27, 2020).

[48] Etsy, Inc., Annual Report (Form 10-K) (Feb. 26, 2021).

[49] Etsy, Inc., Annual Report (Form 10-K) (Feb. 25, 2022).

[50] *UMP Blandin Native American Hardwoods Conservation Project*, 3DEGREES GROUP, INC., https://3degreesinc.com/resources/blandin-conservation-project/ (May 28, 2023, 4:09 PM).

[51] *Giriraj Bundled Wind Project*, 3DEGREES GROUP, INC., https://3degreesinc.com/resources/giriraj-bundled-wind-power-project/ (May 28, 2023, 4:37 PM).

[52] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 21 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

CLASS ACTION COMPLAINT

offset vendor Verra.  Yet recent reporting revealed that 90% of rainforest offsets provided by Verra during this period were predicated on poor baseline assumptions and in fact had zero climate impact.[53]  These issues pervade all prevented deforestation projects due to the inherent methodological issues with calculating *any* meaningful reductions from the protections of forests that are not slated for destruction.

        ii.    Etsy's Offsets are Non-Additional and Therefore Have Little to no Climate Impact

55.    The second reason it is false and misleading for Etsy to represent it is carbon neutral on the basis of its offset portfolio is that Defendant has almost exclusively relied on carbon offsets that are "non-additional."  A project is "non-additional" when it credits carbon offsets for reductions that would have occurred regardless of the involvement of the voluntary carbon market.  Carbon reductions "are additional if they would not have occurred in the absence of a market for offset credits.  If the reductions would have happened anyway – i.e., without any prospect for project owners to sell carbon offset credits – then they are not additional.

56.    Additionality is essential for the quality of carbon offset credits – if their associated GHG reductions are not additional, then purchasing offset credits in lieu of reducing your own emissions will make climate change worse."[54] Accordingly, any project that is non-additional is a carbon offset in name only, such that any claim of carbon neutrality that is even fractionally predicated on non-additional carbon projects is definitively false.  According to one study, "at least 52% of approved carbon offsets were allocated to projects that would very

---

[53] Patrick Greenfield, *Revealed: More Than 90% of Rainforest Carbon Offsets by Biggest Provider are Worthless, Analysis Shows*, THE GUARDIAN (Jan. 18, 2023), https://www.theguardian.com/environment/2023/jan/18/revealed-forest-carbon-offsets-biggest-provider-worthless-verra-aoe

[54] *What Makes a High-Quality Carbon Offset?: Additionality,* CARBON OFFSET GUIDE, https://www.offsetguide.org/high-quality-offsets/additionality/ (May 28, 2023, 5:43 PM).

likely have been built anyway." "In addition to wasting scarce resources," the sale of non-additional offsets "to regulated polluters" has likely "substantially increased global carbon dioxide emissions."[55]

57.    In practice, only "4% of offsets actually remove CO2 from the atmosphere."[56] This is particularly concerning as even though carbon offsetting is not inherently mutually exclusive to initiatives that aim to directly reduce a company's emissions, e.g. reducing energy consumption or transitioning to low- or-no-carbon fuel sources, carbon offsetting often replaces direct emissions reductions because it is typically more cost effective for companies to engage in carbon offsetting than it would be for them to meaningfully decrease the carbon footprint and overall environmental impact of their products/services.  In practice, the low price of carbon offsets often deters companies from pursuing "emissions reductions in their own operations and value chains," despite adequate contributions to global climate change mitigation targets necessarily requiring the "effective reductions of emissions across" "operations and value chains" instead of reliance on offsets.[57] This makes non-additional offsets particularly pernicious for global climate goals; not only do they profoundly underperform other green efforts, but they provide companies a discounted means of claiming they are making a difference when they are in fact doing very little.

58.    Etsy has been identified as having almost exclusively relied on non- additional offsets, with an offset portfolio consisting of prevented deforestation

---

[55] Raphael Calel et al., Do Carbon Offsets Offset Carbon? 1  (Grantham Rsch. Inst. on Climate Change and the Env't et al. eds., 2021).

[56] Akshat Rathi & Ben Elgin, *What Are Carbon Offsets and How Many Really Work?*, Bloomberg (Jun. 14, 2022), https://www.bloomberg.com/news/articles/2022-06-14/what-are-carbon-offsets-and-how-many-really-work-quicktake

[57] European Comm'n, Directive of the European Parliament and of the Council on Substantiation and Communication of Explicit Environmental Claims (Green Claims Directive) 31 (2023).

CLASS ACTION COMPLAINT

and wind and solar investments."[58]  Yet "selling offsets for small sums as a way to support the economics of renewables doesn't provide any real benefit if it's already cheaper than building new coal or gas power plants."[59]  "The issue is timing: many renewable offsets came into being just as solar and wind power established themselves as the cheapest source of energy in most countries."[60]  And, as revealed by an analysis of wind projects in India from which Etsy has purchased offsets, "at least 52% of approved carbon offsets were allocated to projects that would very likely have been built anyway."[61]

59.     Similar additionality concerns are present with avoided deforestation projects.  A 2021 study "found that California's offsets programs systematically over-credits the carbon-absorbing potential of its offset properties by nearly a third."  Further satellite analysis confirmed that "no additional carbon is actually being sequestered in these forests than would have been without the program."[62]

   iii. Etsy's Offsets do not Provide Immediate Offsetting, Misleadingly Claiming Carbon Offsets From Future Decades of Projected Offsets Against Current Emissions

60.     Third, carbon offsets also need to be immediate.  In the same way there's a time value to money, there is a time value to carbon: "Your flight today dumps carbon dioxide into the atmosphere right now, worsening climate change from this day forth.  Saplings planted today won't grow large enough to offset today's emissions for decades, nor will investments in speculative technologies

---

[58] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg
[59] *Id.*
[60] *Id.*
[61] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).
[62] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/

CLASS ACTION COMPLAINT

like nuclear fusion or direct air capture, even if they eventually become viable."[63] The same is true for green technology investments; projections of decades of fossil fuel replacement from a wind farm are a woefully imprecise means of calculating the actual impact of technologies that may well become obsolete in the intervening years.  Consumers have also been told by Etsy to expect that carbon neutral claims are based on immediate carbon reductions, as the very premise of memorializing the carbon neutrality of every individual shipment is that the shipment's omissions have in fact already been offset.

61.　Nevertheless, Defendant's offsets are by definition not-immediate, despite Etsy having repeatedly represented that the company has 100% offset emissions from shipping on a rolling basis.  Defendant claims its purchase of offsets meant that its deliveries were "100% carbon offset" when the offsets in question are in fact only projected future carbon reductions.  In reality, the company invested in various green projects, calculated years of future carbon reductions or non-release from those projects, and then credited all of the years of future reductions from the single year's offset investments against a single contemporary year of emissions.  As Etsy's own offsets middleman, 3Degrees Inc., acknowledged, Etsy's offsets portfolio offers only "estimated emission reductions" slated to occur "within the next few years."[64]

62.　Therefore, Defendant's representations that it "100% offset" all emissions from deliveries due to their purchase of offsets from the voluntary carbon market are in fact false—Defendant had simply invested in projects that, assuming nothing goes wrong, will altogether take all of those future years to offset Defendant's most recent year of carbon emissions from shipping.

---

[63] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[64] Mark Mondik, *How 3Degrees Helped Etsy Lead E-Commerce Towards Carbon Neutral Shipping*, GREENBIZ (Apr. 3, 2019), https://www.greenbiz.com/article/how-3degrees-helped-etsy-lead-e-commerce-towards-carbon-neutral-shipping-sponsored

CLASS ACTION COMPLAINT

1

2

         iv.    Etsy's Offsets are Impermanent and Therefore Offer no Guarantee of Future Performance, Despite Etsy's Carbon Offsetting Claims Relying on Said Future Performance

3

4

5

6

7

8

9

10

11

12

13

14

15

63.    Fourth, Offsets also need to permanently sequester carbon in order to meaningfully combat climate change.  "Carbon dioxide emissions stay in the atmosphere for a century or more, so you must offset an equivalent amount of emissions for at least that long.  Trees planted today are more likely to succumb to wildfire, disease, pests, or extreme weather as the world warms, and do not provide durable carbon storage."[65]  "To counterbalance fossil fuel emissions, therefore, carbon credits must be associated with mitigation that is similarly permanent. If mitigation is 'reversed' (i.e., carbon stored as a result of a mitigation activity is subsequently emitted, so that no net reduction or removal occurs), then it no longer contributes to staying within a global carbon budget, and no longer serves a counterbalancing function. This is primarily a concern with mitigation activities that result in enhanced carbon storage in biospheric reservoirs (including trees, shrubs, soils, and other biological stores of carbon."[66]

16

17

18

19

20

21

22

64.    There is an inherent problem with crediting companies with the environmental impacts of decades-long projections—"[i]t's impossible to prove a counterfactual."[67]  For instance, in the context of prevented deforestation, "[r]ather than just valuing what forests are actually there, which are actively providing a carbon sink or store right now, [carbon offset vendors] have to surmise which forests would still be here versus which ones are the bonus forests that were spared from the theoretical axe."[68]

23

///

24

25

26

27

28

---

[65] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[66] DERIK BROEKHOFF, EXPERT REPORT 7-8 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).

[67] Patrick Greenfield, *Carbon Offsets Used by Major Airlines Based on Flawed System, Warn Experts*, THE GUARDIAN (May 4, 2021), https://www.theguardian.com/environment/2021/may/04/carbon-offsets-used-by-major-airlines-based-on-flawed-system-warn-experts

[68] *Id.* 2

CLASS ACTION COMPLAINT

65.     "Already, there are examples of forests associated with carbon crediting projects being destroyed by catastrophic fires, including projects funded by BP and Microsoft affected by the increasingly prevalent wildfires in the American West (Hodgson 2021). Such impacts are leading credit buyers to re-evaluate the risks of such projects. While some carbon offset programs, such as the Gold Standard, maintain insurance mechanisms to address carbon losses (essentially, 'buffer reserves' of credits that are issued but not circulated), there are questions about whether they are sufficiently robust and it is doubtful that such mechanisms can be effective over indefinite time periods."  For Gold Standard offsets, "the obligation to compensate for 'reversals' (i.e., carbon losses) may extend for as little as 20 years – far short of what is needed to fully counterbalance carbon emissions."[69] Ultimately, "[t]he fragility of biospheric carbon reservoirs has led some scientists to object to any use of [natural climate solutions such as prevented deforestation] to offset fossil carbon emissions."[70]

66.     According to a report by the European Union, carbon offsets sold by the three major carbon offset vendors have in fact routinely credited companies with decades of projected increase in carbon offsetting from projects that subsequently severely underperformed or were, in some cases, destroyed altogether.  Offset vendors claim they insure against catastrophic future events by siloing offsets as insurance, but one study found that "one single disease, on a single tree species called tanoak, would be enough to completely wipe out the credits set aside for all disease-and insect-related mortality."[71]

67.     Accordingly, any claim that Defendant has 100% offset emissions from shipping is false and misleading; deliveries of goods purchased on Defendant's e-commerce platform produce significant amounts of carbon into

---

[69] DERIK BROEKHOFF, EXPERT REPORT 9 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).

[70] Id.

[71] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/

CLASS ACTION COMPLAINT

the atmosphere, and its purchase of fraudulently accounted and dubiously designed carbon offsets in no way make their operation's deliveries produce no net carbon year over year.  Despite the carbon offset market's claims of verification, its ultimate reliance on "ambitious and dynamic crediting baselines that depart from business as usual" has produced inaccurate and misleading accounting.  At the same time, the offsets themselves "lack additionality", are non-immediate, and fundamentally fail to guarantee a permanent impact, all of which render the claim that those offsets make Etsy's "100% offsetting" provably false and misleading.[72]

### F.    Etsy Knew These Statements Were False

68.    It is simply inaccurate to say that offset purchasers are unaware of problems with the voluntary carbon offset market.  Much the opposite is true—there are voluminous pages of industry-wide writing acknowledging the legal risks with continuing to engage in these misrepresentations.  "41% of corporate sustainability officers don't use carbon offsets because they don't trust them," and another "43% are seeking to have them rated or validated" to prevent misleading the public.[73]  At the same time, market leaders in transportation including Lyft and JetBlue have halted their offset programs and retracted carbon neutral claims out of concerns that the offset market is faulty and therefore carbon neutrality claims based on those offsets could be legally actionable.[74] And Credit Suisse, "an early purchaser of renewable offsets, now says it's among the companies shifting towards buying more rigorous removals."[75]  Even Walmart, the world's largest company by revenue, and a direct competitor in the

---

[72] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).

[73] AIDASH INC., CARBON OFFSETTING IN 2023: A CHIEF SUSTAINABILITY OFFICER'S GUIDE TO THE MARKET 4 (2023).

[74] Justine Calma, *JetBlue No Longer Plans to Offset Emissions from Domestic Flights*, THE VERGE (Dec. 9, 2022), https://www.theverge.com/2022/12/9/23501665/jetblue-carbon-offsets-sustainable-aviation-fuel

[75] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

CLASS ACTION COMPLAINT

e-commerce retail space, has made "a zero emissions commitment that does not rely on carbon offsets."[76]

69.    Etsy has admitted as much, announcing in 2022 that it "will phase down [its] investments in offsets" as "in many markets carbon finance no longer has a role to play."[77]  But this has not stopped Etsy from crediting itself with the offsets it has purchased over the past four years, or from continuing to tout its offsetting on the landing page of *every* Etsy sale, or from memorializing those *years* of misleading offset claims on *every* user's account page.

## CLASS ALLEGATIONS

70.    In addition to their individual claims, Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

71.    Plaintiffs bring this class action lawsuit on behalf of a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

72.    "The Class": All natural persons who, beginning four years prior to the filing of this lawsuit to the present and continuing on into the future, purchased goods on Etsy's e-commerce platform.

73.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

74.    Numerosity: Plaintiffs do not know the exact size of the Class, but estimates that the Class is composed of more than 5,000 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

---

[76] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[77] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

75.     Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that Etsy operated an e-commerce platform with carbon neutral shipping.

76.     The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

• whether Defendant purchased carbon offsets that fully offset global carbon emissions from shipping;

• whether Defendant unfairly, unlawfully and/or deceptively misrepresented that it has fully offset emissions from shipping on all deliveries since February 2019;

• whether the use of the term "100% offset" in Defendant's marketing violated Federal and/or California state law;

• whether the advertising of Etsy product deliveries as being entirely carbon offset caused them to command a premium in the market as compared with e-commerce platforms that do not make such a claim;

• whether Defendant's advertising and marketing regarding offsetting emissions from deliveries was likely to deceive the class members and/or was unfair;

• whether a 100% offsetting emissions from shipping claim at the point of sale for every good on Etsy is material to a reasonable consumer;

• whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

77.     Typicality: Plaintiffs' claims are typical of the claims of other members of the Class because, among other things, all such claims arise out of

the same unlawful course of conduct in which Defendant engaged. Plaintiffs and those similarly situated purchased goods on Defendant's e-commerce platform and relied on Defendant's misrepresentations and omissions that it 100% offset emissions from deliveries of good on the platform since February 2019.  Thus, Plaintiffs and the class members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

78.   Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the classes. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

79.   Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

80.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (THE "CLRA"), CALIFORNIA
CIVIL CODE § 1750, *et seq.*)
(On Behalf of Plaintiffs and the Class)**

81.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

82.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

83.     Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

84.     The goods that Plaintiffs (and other similarly situated class members) purchased from Defendant constitute "services" within the meaning of California Civil Code § 1761(a).

85.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that Defendant offset all emissions

from deliveries since February 2019; and that Defendant purchased carbon offsets that meant it did not release any additional net carbon into the atmosphere from shipping on an annualized basis since February 2019.  By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(3), § 1770(a)(4), § 1770(a)(5)§, 1770(a)(7), and §1770(a)(9) of the CLRA. In violation of California Civil Code § 1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code § 1770(a)(3), Defendant's acts and practices constitute improper representations regarding the affiliation, connection, or association with, or certification by, another.  In violation of California Civil Code § 1770(a)(4), Defendant's acts and practices constitute deceptive representations or designations of geographic origin in connection with goods or services.  In violation of California Civil Code § 1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(7), Defendant's acts and practices constitute improper representations that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised.

86.    Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Class will continue to suffer harm.

///

87.     CIVIL CODE § 1782 NOTICE. Plaintiffs notice and demand that within thirty (30) days from that date of the filing of this Complaint, Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and or deceptive practices complained of herein.

88.     Should the violations herein alleged not be corrected or rectified as required by Civil Code § 1782 within 30 days with respect to all Class Members, Plaintiffs will seek to amend this Class Action Complaint to seek, on behalf of each Class Member, actual damages of at least $1,000, punitive damages, an award of $5,000 for each Class Member who is a disabled person or senior citizen, and restitution of any ill-gotten gains due to Defendant's acts and practices.

89.     Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**SECOND CAUSE OF ACTION**
**FALSE ADVERTISING, BUSINESS AND PROFESSIONS CODE § 17500,**
***et seq.* ("FAL")**
**(On Behalf of Plaintiffs and the Class)**

90.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

91.     Beginning on February 27, 2019, and repeatedly again within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of Etsy's e-commerce platform.

92.     Defendant made representations and statements (by omission and commission) that led reasonable customers to believe (i) Etsy operated an e-commerce platform that did not produce any net carbon emissions from shipping since February 27, 2019; and (ii) that Defendant purchased carbon offsets such that it did not release any additional net carbon into the atmosphere on an annualized basis since February 2019.

93.     Plaintiffs and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 33-35 above.  Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing goods on Etsy's e-commerce platform, or paying less for them.

94.     Defendant's acts and omissions are likely to deceive the general public. Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code. These practices, which Defendant used, and continues to use to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

95.     As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

96.     Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from them, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

97.     Plaintiffs seek on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

98.     Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed.  Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").  In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

99.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained

by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiffs, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### THIRD CAUSE OF ACTION
**UNLAWFUL, UNFAIR, AND FRAUDULENT TRADE PRACTICES IN VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *et seq.* (On Behalf of Plaintiffs and the Class)**

100. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

101. Since February 2019, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

102. In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; and (ii) the FAL as described herein.

103. In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that Etsy's e-commerce platform's global shipping was carbon neutral since February 2019; and (ii) misrepresenting that Defendant purchased carbon offsets such that when balanced against the emissions from shipping the goods sold on its e-commerce platform, Defendant did not release any additional

net carbon into the atmosphere on an annualized basis since February 2019, and (iii) failing to inform Plaintiffs, and those similarly situated, that the representations stated in (i) and (ii) above are false.

104.   Plaintiffs and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase goods on Defendant's e-commerce platform, or (ii) paying less for goods and shipping and Defendant's e-commerce platform.

105.   Defendant's acts and omissions are likely to deceive the general public.

106.   Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

107.   These practices, which Defendant used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

108.   As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered and continue to suffer injury in fact and have lost money and/or property in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the price premium they paid to use the e-commerce platform based on Defendant's false "100% carbon offset" representations.

109.   As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of

this Court.

110.   Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendant as a result of Defendant's conduct. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed.

111.   Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

112.   Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

///

113.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## FOURTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION, California Civil Code § 1710.
### (On Behalf of Plaintiffs and the Class)

114.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

115.    Etsy made representations of material fact concerning the carbon neutrality of its e-commerce platform.

116.    Those representations were in fact false.  The truth is that Etsy has in fact produced massive amounts of $CO_2$ from shipping deliveries worldwide since declaring its shipping carbon neutral, and its purchase of carbon offsets did not and could not compensate for that release of $CO_2$.

117.    Etsy was negligent when it made those misrepresentations.

118.    Plaintiffs and the Class did not know the representations were false and believed they were true.  Plaintiffs and the Class reasonably relied upon the misrepresentations made by Etsy when deciding which e-commerce platform to use when purchasing goods.

///

119.   In justifiable reliance upon Etsy's negligent misrepresentations, Plaintiffs and the Class were induced to purchase products on Etsy's e-commerce platform.

120.   Plaintiffs and those similarly situated relied to their detriment on Defendant's negligent misrepresentations. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase goods on Defendant's e-commerce platform, or (ii) paying less for goods and shipping and Defendant's e-commerce platform.

121.   Defendant engaged in these negligent misrepresentations to increase its profits.

122.   As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered and continue to suffer injury in fact and have lost money and/or property in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the price premium they paid to use the e-commerce platform based on Defendant's false "100% carbon offset" representations.

123.   As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

124.   Plaintiffs seek, on behalf of themselves and those similarly situated, compensatory damages, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendant as a result of Defendant's conduct, as well as any other relief as this Court deems just and proper.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against Defendant as follows:

A.  Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.  An award of compensatory damages, including statutory damage where available, to Plaintiffs and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including both pre-and post-judgment interest thereon;

C.  An order for full restitution;

D.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

E.  An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

F.  For reasonable attorneys' fees and the costs of suit incurred; and

G.  For such further relief as this Court may deem just and proper.

///
///
///
///
///
///
///
///
///

CLASS ACTION COMPLAINT

1

**JURY TRIAL DEMANDED**

2

Plaintiffs hereby demand a trial by jury.

3

4

Dated: July 14, 2023                    Respectfully submitted,

5

6

_(signature)_

7

**HADERLEIN AND KOUYOUMDJIAN LLP**
Jonathan Haderlein (Cal. Bar No. 336644)

8

jhaderlein@handklaw.com
Krikor Kouyoumdjian (Cal. Bar No. 336148)

9

kkouyoumdjian@handklaw.com
19849 Nordhoff St.

10

Northridge, California 91324

11

Telephone:  (818) 304-34345

12

13

**RUSSELL LAW, PC**
L. David Russell (Cal. Bar No. 260043)

14

david@russelllawpc.com

15

1500 Rosecrans Ave, Suite 500
Manhattan Beach, California 90266

16

Telephone: (323) 638-7551

17

*Attorneys for Plaintiffs and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Amelia Blackburn, declare as follows:

1.     I am a citizen of Los Angeles California and above the age of 18. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.     At various times in the past four years I purchased goods while in the County of Los Angeles via Etsy, Inc.'s e-commerce platform.

3.     I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Los Angeles, California, this 14th day of July, 2023.

Amelia Blackburn (Jul 14, 2023 12:13 PDT)

Amelia Blackburn

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Taylor Blackburn, declare as follows:

1.      I am a citizen of Los Angeles California and above the age of 18. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      At various times in the past four years I purchased goods while in the County of Los Angeles via Etsy, Inc.'s e-commerce platform.

3.      I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Los Angeles, California, this 14th day of July, 2023.

Taylor Blackburn (Jul 14, 2023 12:15 PDT)

Taylor Blackburn